Mr. Epstein, you ready to proceed? Yes, I am, Your Honor. Okay, thank you. Good morning, and may it please the Court, Robert Epstein for the appellant, Mr. Charles Senke. With the Court's permission, I'd like to reserve three minutes of my time for rebuttal. All right. Thank you, Your Honor. Given that the government has conceded that the district court committed plain error at sentencing with respect to issues three and four, I'd like to begin with issue one and the question whether the district court violated Mr. Senke's Sixth Amendment right to counsel and whether the remand in this case should be for a new trial. Mr. Senke filed a motion with the Court several months before trial entitled, Inadequate Representation, in which he set forth in great detail his dissatisfaction with his court-appointed attorney, who had been on the case at that point for some seven months and, according to Mr. Senke, had done essentially no work on the case other than to put in three requests for continuances. Most disturbingly, Mr. Senke alleged that the attorney would not even review the evidence with him because he considered it to be too disgusting, and he concluded by saying that he could not get a fair trial with him as his attorney. At that point, he did not expressly request new counsel. He didn't do that until after the trial, correct? That is correct, Your Honor, but as this court and the Supreme Court has held pro se motions, such as the one that Mr. Senke submitted, have to be liberally construed, and properly construed, this was clearly a motion for new counsel because he was saying, I don't believe I can get a fair trial with this man as my attorney. What exactly did the note say, the motion, Your Honor? And it said, among other things, that Mr. Comerford, the attorney, would not review the evidence with his client because he considered it to be too disgusting to look at. He wanted new counsel, and he had a co-counsel added thereafter, and he never complained about the right? That is correct, but the co-counsel was Mr. Comerford's associate, and I would submit if there was a problem with Mr. Comerford, such that he should have been removed for a cause, adding his associate didn't solve the problem. But within his request for new counsel expressed for the very first time right after the trial, and never during any proceedings with the trial judge. Not during any pretrial proceedings, but the motion itself was quite clear as to why he was dissatisfied with Mr. Comerford as his attorney. Yes, but when was that motion, when was that motion made? That motion was made in April of 2018. I didn't mean a date, I meant in connection with the proceedings before the trial judge. Yes, your honor, so it was made some seven months after the attorney's appointment, and some six months prior to trial. A request for new counsel was made six months before the trial? No, I'm sorry, your honor, I misunderstood your question. Mr. Sankey's motion, inadequate representation motion, was filed six months prior to trial. I thought he requested new counsel for the very first time after the trial proceedings. Yes, your honor, he didn't explicitly ask for new counsel before, but that I would submit was certainly what was the gist of his motion. Properly construed, that's what his motion was asking for. I think Judge Fuentes is asking about express requests, and the express requests come after trial. Two of them say appealant, meaning appellate counsel, and all of them seem to relate to the performance at trial. None of them seems to be specifically about being afraid or prejudiced to sentencing or something else, just I had a bad lawyer at trial who shouldn't be representing me on appeal. So, especially since it sounds like we're going to send the have to find that that first one that was not expressed still needs to be construed as a request for new counsel. Just to focus our inquiry, this case is really going to ride on that one, right? That's exactly right, your honor. Okay, let's assume you're right under Welty. Okay, Welty was a Faretta self-representation case, but Diaz and some others have extended it to this context of wanting new counsel. Your client, he had a public defender, he fired the public defender, he went pro-safe for a while, then he picked up Mr. Comerford. He's already a frequent flyer, a bit of a troublemaker in the trial court, and Diaz says the better practice is to be inquiring here, right? Now, let's say we read Diaz to say the district court should have inquired here. Let's grant you that now, setting aside Judge Fuentes' concern that it wasn't expressed enough. Even if you're right about that, this is a Sixth Amendment claim. Very few Sixth Amendment claims are structural errors. The ones that are are complete denial of counsel, complete denial of counsel for a phase of a proceeding, or a self-representation violation. So, either you have to show us that this is structural, or you have to demonstrate prejudice. Your brief has not made any effort to show prejudice. Can you make a prejudice showing here today? Your Honor, I could go through various reasons why I believe the attorney's representation in trial wasn't competent, why he was ineffective. That's not the same as the question you're being asked. Let's assume that it was below the level of the Strickland requirement for competence. The second prong is what you're being asked about now, and that is, what if any prejudice resulted from that dereliction of professionalism? Well, what the Ninth Circuit has held in a series of cases like Velazquez and Moore, which we cite in our brief, when a court-appointed attorney should be removed for cause, and we're assuming for purposes of this question that he should have been removed for cause, then there is a constructive denial of the right to counsel. Are you implicitly saying you cannot show prejudice? You're hanging your hat on the structural approach? No, Your Honor. I am certainly not conceding that we wouldn't be able to show prejudice here. No court has ever required that, though, in this situation. If an attorney should have been removed for cause, then it's considered prejudice per se. Let me clarify again. There are two ways you can win. One of them is a structural or presumption. You're pushing that now. Let's get to that in a minute. I want to give you an opportunity. If there is anything you can cite to show prejudice, this is your chance. If you don't answer this question, then we have to take the whole thing on the structural approach. Again, is there anything you can cite to me that would establish prejudice if we required it at prong two of Strickland? I appreciate the opportunity, Your Honor. I want to make sure I understand your question correctly, though. When you say establish prejudice, do you mean that there were things that this attorney did that was prejudicial to my client's trial? Or did not do that he should have done? If we apply to Strickland, is there anything you can cite in this record that would satisfy prong two? Absolutely, Your Honor. For one example, the attorney here did not object to the district court's failure to instruct the jury with respect to an essential element of the instruction. There was no instruction given to the jury that for the enticement offense, they had to find a substantial step strongly corroborating the defendant's belief, strongly corroborating the defendant's intent. That surprises me because he drove to Scranton, which is a pretty substantial step. I assumed you were going to go more on the kinds of omissions that he put it on no defensive trial. And there were certainly things that his own chain of communications with the agent here could have been explored had witnesses been put on the stand that weren't put on it. The substantial step instruction kind of leaves me a bit confused because it does seem to me that that's a real hard way to go. They would have found a substantial step. He got in the truck and drove to Scranton. Judge McKee, I was only getting started. That was the first of a number. Wind up with more. Go ahead. That was a wind up of error. But that is important in and of itself. And there's cases that say that travel after the fact can't be a substantial step towards the enticement necessary for the 2422 conviction. Be that as it may, if you look at the judge's opinion that could be found a docket 89 in which the judge denied the government's motion to preclude an entrapment offense, the judge goes through great detail of the evidence concludes that there is ample evidence of entrapment in this case by which a jury could find entrapment. If you compare the judge's opinion with the closing argument that was given in this case, you will see how inadequate the closing argument actually is. All of the facts that the attorney did not utilize because of his lack of preparation in this case. Why could it be that counsel had a strategy and then what are their strategies to try to diminish the the conduct that occurred because it would have such a significant impact on the jury? Maybe that was a strategy. I don't think there would be any strategic reason, Your Honor, for not referring to many of the facts that the judge himself referred to in the opinion that he wrote, explaining why entrapment in this case could be easily found by a juror. Mr. Epstein, aren't these kinds of prejudice inquiries the kinds of things we normally remit to collateral review, where you can have a fact finding record about would he have made this argument? Was there a tactical reason to forgo this, etc.? It's highly unusual that we would hear this on direct appeal. Yes, Your Honor, and that's why we didn't raise it on direct appeal. That's why no court has ever required this kind of prejudice showing when a court-appointed attorney should have been removed for cause. So if you look at the Benitez case, for example, where there was a failure on the district court's part to inquire, there was no reason given at all for the defendant's dissatisfaction in the case, but yet the court remanded for re-sentencing, and that's where the dissatisfaction was raised for the first time at sentencing. Likewise, in the Ninth Circuit cases, Velazquez, Moore, and several others cited in those cases, they remanded without any showing of prejudice for new trials because the attorneys in this those cases should have been removed for cause, which is exactly what we have here. Okay. Now, you did want to make a structural error or presumption of prejudice argument. Can you suggest why this failure to inquire should be put in the same very small category with the very few other errors in which we treat as structural and don't require a showing of prejudice? Well, if we look at the Supreme Court's case in Gonzalez-Lopez, where they found structural error where counsel wasn't removed. Now, that, of course, was a case where the counsel was retained, but Mr. Sankey here sits in the same position at the point where his counsel also should have been removed for cause. At that point, he's in the same position. He has a right to a new attorney. He doesn't have a right to a new attorney. A private client always has a right to change a retained attorney. Someone with an appointed lawyer does not have a right. He has to demonstrate that there's going to be a Strickland problem, and if the court finds not, then he doesn't have a right to change. So it's different. Well, respectfully, Your Honor, he doesn't have to demonstrate a Strickland problem. He has to once he demonstrates good cause, then he's in the same position as anybody else. He has a right to a different attorney. And what the Supreme Court said in Gonzalez-Lopez, we cannot evaluate how another attorney might have handled this case and what the result would have been, and that's why it's a structural error. He really did make the request to remove counsel in the course of the jury or in the course of the proceedings. He did lay out all of the reasons why his attorney should be removed. He just didn't put the final sentence on the page. So therefore, please remove my attorney. It would be as if a pro se defendant filed a fourth amendment. But it's not the same thing. You're suggesting that maybe the judge should have interceded and made a decision for him, which really doesn't make sense. Well, what the judge should have done was intercede and inquire as to Mr. Sankey's dissatisfaction. And there was a pretrial conference here where the attorney himself corroborated what Mr. Sankey was saying. He made clear that he had been on this case for some, at that point, almost a year, and he did not even know what motions had been filed in the case. He had to ask the prosecutor, so what motions did he file? And his position at that hearing was, I told my client he doesn't get any more, he doesn't get any motions from me because he filed motions on his own. And that was plainly wrong. The judge, when he appointed Mr. Comerford, had given him an opportunity to file motions, but the attorney had not even done any due diligence in the case to even look at what motions had been filed. But we need a record. We need a record and an evidentiary hearing to know that you're drawing an inference from this, but why isn't the right thing to remit this claim to habeas and then get a factual development on that? Because habeas only looks at the question then of whether there was ineffective representation. And to do that is basically to vitiate the rule of wealthy, which is that a district court abuses its discretion if it doesn't inquire when the defendant raises dissatisfaction with his attorney. You would just be putting it all in the bundle of, well, if he got effective representation at trial, then there's no problem if the district court didn't do what needed to be done prior to trial. As I said, wealthy was a self-representation case, and self-representation is one of the very few structural errors, because it's not about the outcome. It's about the autonomy of the client. When we're outside of self-representation, I guess this goes back to the prejudice point. If you can convince us that it's a structural error, then we should reverse it. But if you can't convince us it's a structural error, then there's enough of a remedy dealing with Strickland on collateral review. And I guess I'm just having a hard time understanding why we need to automatically reverse based on mere failure to inquire as opposed to some demonstrable effect on the outcome. As the Ninth Circuit and the Sixth Circuit have ruled in these cases, where there is cause to remove the attorney and the defendant is made to go to trial with an attorney who should have been removed because there was good cause to remove him because of a breakdown in the attorney-client relationship, he's effectively being denied his right to counsel. It's a constructive denial of the right to counsel, and at that point, they consider it to be structural error. Your time is up, Mr. Epstein. Unless Judge Fuentes has additional questions, you've reserved some time for rebuttal, and we'll hear from Ms. Olszewski. Thank you very much, Your Honor. Thank you. Ms. Olszewski? We're not hearing you. You're muted, Ms. Olszewski. Okay. Good morning, Your Honors. My name is Michelle Olszewski, and I represent the United States in this case, and this Court should affirm the judgment of conviction and sentence in this case with the exceptions that were noted by the government regarding sentence. Mr. Sinke's April 20, 2018, omnibus pretrial motion was not a specific request for new counsel, and the District Court did not abuse its discretion in not construing it as such. But it was a pro se motion, and we do say there's a long line of cases from our circuit, and every other circuit, and the Supreme Court, that commands that we interpret liberally pro se pleadings. He did that pro se. Now, granted, it's an omnibus motion, and it's pretty good for someone who's not a lawyer, so you can make the argument, but he clearly has some awareness, some knowledge, and he could have just added the last sentence, as Mr. Epstein noted. But still, it's a pro se motion, and how can we read that letter, or that motion, and include anything other than the fact that he was dissatisfied with his attorney? And there was, as I think you yourself conceded, the State concedes, there was a totally inadequate inquiry by the trial court after that. The trial court basically says to the lawyer, did you know your client's trying to fire you? And the lawyer says, or I guess your client's trying to fire you, and the lawyer goes, geez, I didn't know about that, but there's been no communication between the lawyer and the client. Your Honor, I would disagree with that statement of the facts, because that's not what happened at the pretrial conference. What happened? Tell me what happened. Actually, I was the one who asked the question of Attorney Comerford, is he trying to fire you? And the reason why I asked that, it was just kind of an off-the-cuff kind of question, because... It makes it worse. You ask an off-the-cuff kind of question, the kind of informal banter that they're professionals and have a good relationship and a professional and cordial relationship. So you're saying the court didn't make any inquiry? I'm not saying that, Your Honor, and what I would say is that the party sitting at that table, the judge, Attorney Comerford, Attorney Parkins, and myself were well aware of Mr. Sankey. We were well aware of the difficult client and criminal defendant that he was, and I would say that there was some inquiry at that. What was it? Where is it on the record? At the pretrial conference, and that is at appendix... The pretrial conference starts at appendix 332, and I would say that essentially, Attorney Comerford confirms that there's no conflict of interest between himself and Mr. Sankey. He confirms that the communications, that there has not been a complete breakdown of communications because he's talking to him and communicating with him. Well, but Sankey says that that's not true in his motion. So you're telling me that what we said after Welty, I think we said it in Diaz, and what we said is... I'll read from it. Our precedents after Welty, and again, as Judge Bevis mentioned, Welty was a Ferretta case. This is not Ferretta, but we've extended it in Diaz to this context. Our precedents after Welty command that even when the trial judge suspects the defendant's contentions are disingenuous and his motives impure, a thorough and searching inquiry is required, not suggested, but required. How can it be a thorough and searching inquiry when the defendant's not even there, not even asked anything, and the lawyer, whom the client says is not communicating with, and the lawyer goes, everything's cool. We're coprosthetic. Let's move on here. And what I would say to that, Your Honor, is that the Welty case and the Diaz case, that was decisions in the face of specific requests and repeated requests for new counsel. What we have with Mr. Sankey is one request, not even a request, just a litany of complaints about current counsel, one time in a period of 11 months. I'm sorry. You're saying that that did not raise the duty to inquire under Diaz. That's what you're arguing. Technically, the district court, and there's no precedent for the district court to intervene when there's no specific request. The question is, even given the way we interpret pro se motions liberally, you're saying, given what that April motion said, that did not raise a duty to inquire under Diaz. That's what you're arguing. You have to argue that, really. I am. I am arguing that, Your Honor. And I'm arguing that this is a case, as all cases have to be viewed in context. I believe that there was no specific duty on the district court in this case to inquire. However, I do believe that the district court took action. And the reason why I say that is because, and I'll get to the pre-trial conference in a moment, but a few months after this letter, this motion was filed by Mr. Sankey, Attorney Comerford filed a specific request with the district court saying, hey, essentially, I have a difficult client. We're going to trial. We're getting ready for trial. I have a lot of discovery to review. I need help. And I believe the district court took what I will characterize as an extraordinary step and appointed a second attorney to Mr. Sankey. His associate. Comerford's associate. Granted, his associate, but Mr. Sankey now has two court-appointed attorneys for a case that is not a difficult case. This was a two-day trial. Yet, Mr. Sankey was a difficult client. That's not something- Well, why couldn't, even without the judge's intervention, maybe I'm missing something about the nature of the firm. I assume that Comerford could have, on his own, without the court intervening, brought the associate in and said, I need some more horsepower here. I want you to help me with this discovery. That, to me, is not what I consider appointing a co-counselor. To say to someone in the same firm, okay, you helped your partner out. I would say that attorney Comerford did not do that on his own. He certainly could have pulled attorney Parkins in to sit beside him at trial and assist him, but he took formal action. He went to the court and asked the court for assignment of co-counsel. Again, that was an extraordinary. I think we're viewing that through two different sets of extraordinary, but I agree it was very extraordinary for a judge, given what we said in Diaz, to say, okay, I'm going to have your associate help you out here. That was extraordinary. I agree with that. Going forward now, that one list of complaints that was in April 2018, April 20, 2018, we have action taken by the district court. A few months later, Mr. Sankey then has two court-appointed attorneys. We have a pre-trial conference where attorney Comerford tells the court, I have a difficult client. To my knowledge, he's not trying to fire me. He wants, and he's saying that he's not happy with me because he wants me to file motions. I believe motions have already been filed. In fact, the district court ruled on nine specific motions filed pro se by Mr. Sankey. I would agree with the court that this is not an inarticulate defendant. He's quite articulate. If you go back and look at the pro se motions and letters and briefs that were filed by Mr. Sankey for the period of six months that he represented himself, they were quite articulate. He knew what he wanted. He knew what to ask for, and he knew how to ask for relief. Let's assume we disagree with you. Let's assume, as Judge McKee said, that because this is pro se, the April motion should have been construed more liberally. Let's assume under Diaz, the better practice would have been to hold some kind of hearing here. If the district court didn't do that, if we say Diaz means it should have done that and didn't do that, what's the remedy? Mr. Epstein argues this is a constructive denial of counsel and this is a structural error. Why do you think that this shouldn't be treated as structural and rather we should be looking for case-specific prejudice? I think this should not be viewed as a structural error because in context, there was an inquiry and there was action by the district court. Ideally, should the district court have done a more thorough searching inquiry? Perhaps, but again, an extraordinary step was taken and that is giving him another attorney to communicate more with what all the parties involved knew was a particularly needy client. That didn't seem to address what appears to be a total breakdown in communication between counsel and Mr. Senke. Again, I think the district court should have done a more searching inquiry into the nature of Mr. Senke's problem. I don't believe there was any evidence of a complete and total breakdown in the relationship and I say that because we have a one-time issue that's raised by Mr. Senke six months prior to trial. A few months later, we have attorney Comerford advising the court that essentially, I'm communicating with my client. He doesn't want to resolve this. We are going to trial. There's a lot of discovery here and I need assistance. So, the district court had reason to believe that communications were ongoing, that there was not a complete breakdown and in fact, Mr. Senke from that point on, in fact, there was another six months, an entire trial and he never complained again. You're saying in that sense, it's like DS where after the initial discomfort was raised, the judge could have concluded that or whatever problems that may have existed have been resolved and therefore, I don't need to take any further step. That's what you're arguing. I think that's accurate and I think the record confirms that. You're making a case-specific argument on this record. We'll hear from Mr. Epstein on rebuttal if he disagrees with your characterization of the record. I'd like to hear anything further you want to say on the record and then I'd like to hear you speak to the legal issue, which is assume we buy Mr. Epstein's characterization of the record. If this wasn't enough under DS, just assume that after you talk about this record. Why should we not treat such errors as structural ones, just in terms of making a rule for future cases? I'll preface this by saying that I don't believe this was a structural error for the reasons that I've argued, but if it is a structural error and the court finds as much, I don't believe prejudice comes into the equation and it would require reversal. I don't believe that the facts support that here. I'm not asking about the facts in this case. I'm asking whether as a legal matter, we should characterize failures to comply with DS. If this is what actually happened, just set aside the facts of this case. Let's talk generally. If a judge is supposed to conduct this inquiry and doesn't conduct this inquiry, is the right rule automatic reversal or does the right rule require prejudice? Why, Mr. Epstein says, automatic reversal. Do you have a counter argument as to why we should look at case-specific prejudice and not treat this like other structural error cases? I think precedent, Your Honor, would dictate that prejudice is not to be considered on a deprivation of a Sixth Amendment right to counsel is a structural error. I think it's hard to look at these cases specifically and have that firm line. However, that's what the precedent dictates at present. This is not a case where structural error occurred. This was not a deprivation of Sixth Amendment right to counsel. This is a case where some inquiry occurred and action was taken by the district court. I believe that Mr. Sinke was treated beneficially by virtue of his April 20, 2018, pro se letter. We went through an entire trial, another six months, never raised the issue again. I think that when the action was taken by the district court, which again was extraordinary for our district in this kind of case, he was happy. If my colleagues would like to hear more about this, by all means, we would. Your time is running low. After they're done with this issue, I would like to ask about condition one of the conditions of supervised release. First of all, is there anything else my colleagues want to talk about on this issue? I have nothing further. No. Just one thing, and that is, there were no witnesses called by defense. I'm not even sure if this requires an answer, but one thing that troubles me here. Now, I don't know anything about Sinke other than what's in the briefs and the record here, but he apparently argued at some point, he says purported by Mr. Epstein at some point, that he was incapable of actually having sex with this purported 14-year-old absent a Viagra. When he went down, they didn't have any Viagra. He relies on the fact that he went through a long period of time where he didn't answer the agent's responses. The agent reached out to him 13 different times to try to entice Sinke to meet and have sex. It just seems to me that, and again, this is totally theoretical, and maybe what Sinke is saying is total nonsense, but one thing a defense attorney would want to do is find out who does he have a prescription for Viagra, who prescribed it, and talk to the doctor, and if the doctor will say, yeah, the guy is right. He absolutely cannot perform absent some kind of prescribed medication. It seems to me that's a very different case in terms of what his intent was when he goes to Scranton. Was it to have sex with this purported 14-year-old, or was it, as he claimed, just to have lunch with him and say, hey, bug off? It's hard for me to get past that in terms of prejudice. I know we're not focusing on prejudice here. That would be maybe something that could be based on habeas, but I toss that out to you as a concern. You don't have to answer that unless you want to, because the sentencing here really troubles me, but go ahead. I can't answer that, Your Honor, because I'm intimately familiar with the facts of this case. Probably not the best choice of words, Ms. Olszewski, but you know the record well. I do, and I can tell you that Attorney Comerford, if there was, he did try to put one witness on behalf of Mr. Sinke. This is not part of the record, but I was there, and since you asked, and when the FBI did an investigation into the proposed witness to speak to the character of Mr. Sinke, come to find out that that witness was, in fact, charged with sex offenses very similar to the sex offenses that Mr. Sinke was charged with. We advised Attorney Comerford of that before he put him on the stand, and in my view, Attorney Comerford wisely chose not to put that witness on the stand. I can also tell you that the charges for which Mr. Sinke was convicted did not require a sexual act, only the intent to perform that sexual act, and when Mr. Sinke was apprehended, he had condoms and lubricant. I understand that. Maybe we can move on. I know your time is up, but we'll give Mr. Epstein additional time, too, because the sentencing issue here is troublesome, and you've conceded, and I appreciate that. I think we all do. Part of the conditions were inappropriate, but let me ask this, and maybe you can help, maybe we can enlist the help of your office. We have written, Judge Becker had an opinion, I think, 17, 18 years ago. I wrote Balker. That was, I think, 2007. Judge Bibas has since written an opinion. What can we do to make judges understand they cannot issue conditions of supervised release that say you cannot have access to a computer, you cannot have access to the internet? That is such a blatantly absurd condition in this day and age. It means you can't even drive a new car, because new cars, at least when Balker was written, I think the information was, the average new car 13 years ago had 14 CPUs in them, and now it's probably up to close to 50. How can we get judges to understand you can't do this? Well, you can continue to offer opinions, such as Helena. Do you have any idea how frustrating it is? You sit there, you craft these opinions, and you put, believe it or not, we put a lot of time and energy into it. The whole court gets involved in the presidential opinion, and it is Helena was a decision that came after this case. Yeah, but Balker wasn't, and I came in with Judge Becker's case. That was, I think, 2004 case. It's true, but in this case, Judge, despite being, having the authority to impose these conditions for a lifetime on Mr. Sinke, he did so for a period of 10 years, and he did so because of the nature of the crimes. This was a trial judge who was, again, incredibly familiar with the fact of this case. He referenced the fact that he believed Mr. Sinke needed mental health treatment because of how nasty... He clearly did, he really did, but even if it's a 10-year ban and not a lifetime ban, that doesn't go to the fact that you just can't do that. You can't ban someone from the internet for 10 years. You can't go to an ATM machine and get money. Technically, you really can't make a phone call on an iPhone, which is about the only kind of phone that or an Android device that you can find nowadays. This thing on my wall behind me is a relic, this old push-button phone. Those are all computers, and it's just, maybe you can sense my frustration. I totally agree with the court's view on the conditions that the government is conceding, and for those purposes, the case needs to come back for more tailoring, for more specifics, so that Mr. Sinke knows what he's prohibited from doing during the term of supervised release. Mr. Shefsky, as long as we're sending it back on sentencing, I want to ask you about condition one, which is this at least two periodic drug tests. Section 3583D says at least two periodic drug tests after the initial one, as determined by the court. Now, three of our system circuits have said that there's a non-delegation problem with leaving the number of drug tests up to the probation office. If we find that that issue is in this case, should we join those circuits and say the court needs to give more guidance here? Because all the court said here is that there should be periodic drug testing. My response to that, Your Honor, would be that this is not a non-delegation or an over-delegation to the federal probation by the district court because this, for example, Mr. Sinke had a history of being a functional alcoholic, had a history of cocaine and crack use, and the district court was aware of that and referenced that in sentencing. He knows that there was a familiar history of alcoholic abuse as disclosed by Mr. Sinke, again, all part of the PSR. And the drug testing for sex crimes, alcohol-related, is inherently important for these kinds of crimes. And the federal probation officer is merely doing the testing. It will be up to the district court to deal with any results that are unfavorable to Mr. Sinke. So, ultimately, the district court, in imposing these delegations to probation, will have the final say as far as consequences are concerned. So, I'm not concerned with the fact that, and neither should this court be concerned with the fact that those administerial duties are in the power of the probation office, especially because we're dealing with drugs and ultimately any consequence flowing from that will be up to the district court. The polygraph is something which struck me as a bit unique here, and I can't now remember offhand how frequently he was to take a polygraph. But in my experience, and it's limited in this area, especially in sex offenders, it may well be warranted, but it's done very infrequently, and usually at the very beginning as a kind of a therapeutic tool as opposed to a tool to determine veracity. And I wasn't sure in reading the conditions whether or not the court was looking at that as something that probation could look at to determine veracity, or was it a tool that probation was to use in terms of treatment and rehabilitation and perhaps getting the defendant to face up to his own problems. Do you have any insight on that? When I view that special condition, I view that as, again, administerial delegated power to the federal probation for purposes of protection of the public in these kinds of crimes. It's critical that Mr. Sankey be guided during a release. Therefore, it's critical for him to be monitored and questioned about what he's doing and why he's doing it. Well, then you're getting at veracity as opposed to, well, maybe you're saying it's the same thing, but as opposed to treatment. I believe it could be both, Your Honor, because if his veracity is proven, if it's proven that he's not being truthful, perhaps further questioning can bring him around, and then perhaps that will disclose further treatment, redirection, all for the purposes of rehabilitation of Mr. Sankey. Let me just ask one more condition, and then we can wrap this up unless my colleagues have any questions. I don't know if you agreed or not to the special condition that he avoid places where it's likely he would encounter children under the age of 18, but if you didn't agree to that, that struck me as something which is totally unworkable. It means he couldn't go to a baseball game, a football game. I'm not talking about Little League now. I'm talking about the Phillies and the Eagles. Where things are going, no one may be going to Phillies and Eagles games for a while, but how would someone know in going someplace whether or not it's likely to encounter children under the age of 18? And even if it were in the context of a football stadium or a baseball park, what does it matter? It seems like that was one of the conditions. It just seems a lot of stuff was thrown in here, and the pot was stirred, and what came out of it was conditions of supervised release with very little thought being given to tailoring these conditions to Mr. Sankey. I believe that that is a condition that is routinely imposed for these kinds of defendants convicted of these kinds of crimes. That is standard? It is absolutely a condition, and I also think that at some point, this has to come down to common sense. Clearly, part of these conditions informs Mr. Sankey. Look, we're not talking about incidental conduct that you encounter in your everyday life, like going to movies or going to the grocery store, but everyone can agree, everyone of ordinary intelligence can agree that if you go to a we all know kids congregate, a little league baseball game, and you're there by yourself, that should and does raise red flags for someone who is a sex offender. If we think the condition is worded somewhat vaguely, can we save it by just limiting it to the parks, the schools, the playgrounds that are expressly enumerated? Because as you say, read broadly, it can't be that you're going to have to worry about whether he could go to the supermarket or church or some other places where likely, how likely does likely mean? You want to focus on the places that are really tailored to drawing kids in a position, in a place where you could cruise. So is the right remedy, if we're concerned, to strike it down or narrow it? I think the right remedy to alleviate any and all concerns would be to tailor it, be more specific, carve out specific known places where children congregate. Certainly it could be more narrowly tailored. Congregate is a good word because the way it is now, presence, that does include the that does kind of hone into what the concern is here. I would agree with that, Your Honor. So to answer Judge Bibas, yes, I believe that since this case is going back on those conditions, because the government has conceded that, why not tailor it more? Why not require that of the district court? Thank you. Anything else, Judge Bibas or Judge Fuentes? No, not me, no. Okay. Ms. Wojcicki, thank you very much for your argument. Mr. Epstein? Thank you, Your Honor. Turning first to the structural error issue, I want to point out initially, the government didn't contest this in their brief. The government didn't argue that any structural. They didn't concede it either. They didn't say that any error here would be constructural. Structurally, they just didn't address it. Exactly, Your Honor. And no court that has addressed this issue has required a showing of prejudice. And this court in Diaz, in finding that that case presented a close call, didn't look for a showing of prejudice either. Now, I can give good reasons why a showing of prejudice should not be called for in a situation like this. You know, the close call in Diaz as to whether or not there was an abuse of discretion. The court wasn't talking there about whether or not it's a close call vis-a-vis structural error. The structural error wasn't discussed in Diaz. That's correct, Your Honor. But obviously, if the court was requiring prejudice, then there wouldn't really have been an issue about whether the court abused its discretion or not, because there would just be a determination. There's no prejudice here. If there was any ineffectiveness, raise it on collateral review. Now, I would submit there's good reason for not requiring specific showing of prejudice if there's good cause to remove an attorney. Let me give an easy example, and then I think this case is pretty close to it. The easy example would be if the attorney, say, in a case like this, made some type of homophobic slurs against his client, to his client. The client raises that in a motion asking for removal. The judge denies the motion. It goes to trial. I don't think a requirement of showing of prejudice would be necessary there, because you have no way of knowing how the impact of the jury, whether explicitly verbal or whether nonverbal communication. Likewise here, if the attorney is so disgusted by this evidence that he will not even review it with his client, we have no way of knowing how that might have impacted the jury, how he might have communicated that to the jury nonverbally. Likewise, pre-trial, he communicates to the judge that he would like to file a motion ostensibly seeking leave to file additional motions, but he doesn't really want that to be granted. He wants that to be denied. The clear implication of that is that he would then go to his client and say, look, I tried on your behalf to get the judge to give me permission to file more motions, but he wouldn't go for it, so I can't. So he'd be like that, then I don't think there's any need for a further showing of prejudice. It is, if I may, it is accurate that his very first request for new counsel was expressed for the first time post-trial. In other words, there was expression of frustration, but was there ever an explicit request for a lawyer at the trial stage? No, Your Honor, but I think if the motion is properly construed as a pro se pleading must be, then it's obvious what he's asking for there. And he is asking for a new trial, though he doesn't explicitly say so. He's saying, I can't get a new, a fair trial with this man. He's not doing any work on my case. He won't even review the evidence with me. Okay. All of that is your generous reading of that motion. Okay. It may well be that if Mr. Comerford was asked his version, he'd say, I didn't say that. And I did review the evidence. And so why isn't the right remedy? We can't have a hearing now. Why not have a hearing on habeas about whether that's what in fact happened? Because all we have at this moment is your particular construction of his one request pre-trial. And as Judge Winters said, like after this, there were six months until trial. It looks like their communication resumed. There are other things the lawyer did. He didn't renew any complaints. So why shouldn't this be subject to a proper airing at an evidentiary hearing rather than our reversing based on his word for it? What I would suggest, Your Honor, the Supreme Court suggested this in Martel in a footnote. No court has actually done this, though. Every court has treated this as structural error. But if this court was going to say, you know what, there needs to be a hearing about what Mr. Comerford would have said, then I would suggest the appropriate remand would not be in the context of a habeas proceeding where their Strickland requirements would come into play. It would be for a determination on as to whether substitution should have been made here. And if substitution should have been made here, then he gets a new trial because he should have had a different attorney. And there's no way of knowing what that different attorney would have done at the trial. Wait a minute. What exactly would have triggered the substitution of counsel, at least in the eyes of the court? What exactly would have alerted a judge that substitution is necessary here? Yes, Judge Fuentes, several things. First of all, Mr. Sankey, in his motion, says he's not communicating with me. He won't even review the evidence with me because he thinks it's too disgusting. Then at the pretrial conference, the judge hears directly from the attorney. Excuse me for one question, though. Did he make those comments in open court before a judge? He wasn't given the he wasn't asked. He wasn't. The judge didn't make any kind of inquiry as the judge was required to do in open court. So this this was made in a motion. But then the judge does hear from the attorney in the sense that at the pretrial conference, he confirms what Mr. Sankey is saying. He says, Mr. Sankey wants me to file a motion. But I told him, no, you filed your own motions. You don't get more motions. Now, that's wrong as a matter of law. It's wrong as a matter of his representation. And most disturbingly, he doesn't even know what those motions were. He has to ask the prosecutor what motions Mr. Sankey filed. And then it gets worse because he actually proposes to the judge that he file a motion, a bogus motion in which he would ostensibly ask for permission to file additional motions. But he doesn't want the judge to grant it. He wants to deny it. And he would then go to his client and lie and say, I tried for you. I tried to get the judge to let me file more motions, but he won't let me. And that's an attorney who has to be removed at that point in time. As you're reciting those facts, through the glory of Zoom, Ms. Olszewski is shaking her head in disagreement. Let me ask you to submit a 28-J letters to do exactly where in the record that exchange occurred between Mr. Comerford and the district court. Your Honor, if I may, it is set forth in our reply brief in detail. Okay. Go ahead. So at that point, I would submit the judge really doesn't have discretion. At that point, Mr. Comerford should have been removed. And at that point, he gets a new attorney. And there's no way of now knowing what the results of the trial would have been with a different attorney. That's what the Supreme Court held in Gonzalez-Lopez. That's why a prejudice analysis isn't appropriate here. And it's considered structural error. Is there any other question? Julio, do you have a question? No, Judge McKeon, I'm fine. Okay. Judge Bevis? No, nothing further. Okay. Thank you very much for a very helpful argument. I would like to get a transcript of the argument. And once we break, well, I'd like to take a brief break before we hear from counsel in the next case. And Greg can go over with you both just how you mechanically get a transcript. And given the circumstances, I'd ask for the government to pay for the transcript. Okay. Thank you very much. Thank you, Your Honor. And thank you both, counsel, very much.